1. "Where two persons are jointly indicted for murder, each may be convicted upon evidence showing that he was either the absolute perpetrator of the crime, or was present, aiding and abetting the other in its commission." Bradley v. State, 128 Ga. 20 (3) (57 S.E. 237). See also Johnson v. State, 151 Ga. 21 (2) (105 S.E. 603); Adkins v. State, 187 Ga. 519 (1) (1 S.E.2d 420); Nelson v. State, 187 Ga. 576 (1 S.E.2d 641); Screws v. State, 188 Ga. 678 (4 S.E.2d 601); Bruno v. State, 189 Ga. 74
(3) (5 S.E.2d 376).
2. The evidence was sufficient to authorize the jury to find that the defendant, jointly indicted with another for murder and tried separately, was present, aiding and abetting the other, the actual perpetrator of the crime, and, under the above cited authorities, to return the verdict of guilty.
Judgment affirmed. All the Justicesconcur.
 No. 16216. MAY 13, 1948.
 STATEMENT OF FACTS BY DUCKWORTH, PRESIDING JUSTICE.
J. B. Beetles was jointly indicted with William Cular Davis for the murder of C. B. Wike, and was found guilty and sentenced to be electrocuted. The evidence was substantially as follows:
Dr. J. E. Powell testified that he made an examination of the deceased on the day of his death; the cap was removed from the lower back part of his head, the skull had been crushed in the occipital region, and there were four pieces of these fractures. The radiating line connected with the fractured portions was bloody inside and out immediately on the back part of his head. *Page 628 
There was a clot of blood, and the rupture of the blood vessel apparently from a blow of some heavy instrument caused the clot, and this injury was the cause of his death. The death of C. B. Wike was caused from a cranial hemorrhage in his head caused from a blow. His body was badly burned, charred to a crisp, both legs and both hands burned, the right leg destroyed up to the knee and the left practically the same. The burns were also sufficient to cause death. The witness did not think that falling timbers after the building was set on fire could have caused the injury on his head.
Benny Geter testified: He knew the defendant. On January 16, the day the store was burned, he saw the defendant at Cular Davis's house about 10 o'clock in the morning. He said to the witness, "Come on and let's go up to the store and knock the old man out and take his money." He was talking about C. B. Wike. The witness asked Beetles if he was crazy. It was about 8 o'clock when he had that conversation and left about 10 o'clock. The store was located in Carroll County. He came back about 2:30. He went by the store when he left Cular Davis's house and came back by the store on his return. When he left, the store was standing. When he came back it was burned down. He stopped by Cular Davis's house. J. B. Beetles was not there then, and the witness did not see him any more that day. Cular Davis was not there. After the conversation with Beetles in the morning, the witness saw him have a conversation with Cular Davis right in front of Davis's house. Prior to the time that Beetles asked the witness to help him rob the store, neither Cular Davis nor Beetles said anything to the witness about robbing Mr. Wike. He did not hear Davis say anything about it.
Beatrice Chism testified: She knew J. B. Beetles and Cular Davis. She was visiting at the house of Davis when Mr. Wike's store burned and saw Beetles and Davis there. Beetles spent the night there. In the morning she noticed Beetles and Davis standing in the back yard talking. She was in the kitchen. They left about 11 or 11:30. Davis left by himself. Beetles started down the path. Some woods were close to that house and the scope of the woods leads up to the back of Mr. Wike's store. *Page 629 
Beetles was gone about thirty minutes. He came back in the house by the same door through which he left. He came back ten or fifteen minutes before Davis came back. She noticed the store burning when her mother came in, and that might have been about twenty-five minutes after Davis and Beetles came back. The store is but a little piece from Davis's house. She did not see the fire but saw the smoke.
Mrs. Estelle Gant testified: She was in the store of C. B. Wike on January 16, 1948, and saw the defendant there. It was pretty close to dinner time and she stayed about twenty minutes. Mr. Wike asked the defendant what he wanted, and he said "Not anything right now." She bought some smoking tobacco and drank a Coca-Cola. She had seen the defendant before. She left him there sitting down and went home. She lived back of the store. In about thirty-five minutes her husband noticed the fire and smoke at the store and she and he went there. The store was burned. Three or four men were there. She saw the body of Mr. Wike. He was pulled out and was lying there where the store was burning. He was dead. She lived a quarter of a mile from the store. There was a pine thicket between her house and the store. When she left the store to go home before the fire, she left nobody there but the defendant with Mr. Wike. She knows Cular Davis but did not see him that morning.
Henry Gant testified: When he and his wife went over to the store when it was burning, he saw somebody leaving from the store. The man he saw was going along the way towards the defendant's house, but he did not recognize him. He was walking very fast, going across a broomsedge field out to the road, and was about a quarter of a mile from Mr. Wike's store when the witness saw him. He would say that the defendant lives about a half mile from the store. He did not see the man leave the store. He saw him over near the road, going through some broomsedge. There are some pines there, broomsedge and pines, not very thick. The witness was about a quarter of a mile from the man, not quite a quarter, when he saw him going through the broomsedge along the edge of the pine thicket, which was not between them. It was something like 12:30, and the *Page 630 
witness saw him before he could see the fire. "I looked over there and saw the smoke. I saw him before I saw the smoke. I saw him when I saw the fire, saw the smoke. He was going in a hurry. I don't know who he was. I know this defendant here. I would know him when I saw him. . . I would say Mr. Wike was about sixty-five years old. His health was pretty good, got around all right. . . He lived there alone."
W. C. McLemore testified: He was an investigator for the Georgia Bureau of Investigation. Upon his arrival at the scene of the burning he inspected the body of Mr. Wike, and after the coroner's inquest talked with the defendant. The defendant told the witness that he spent the night at his mother's house. Then the witness faced him with his mother, and she said he did not spend the night there. Otis King was with him, and they took the defendant to the place of the fire where there was a track on a culvert where it comes out of the field and then stopped in the road. He placed his foot in the track, and the witness remarked, "That fits, doesn't it?" The defendant answered, "Yes, it sho do." Then he said, "You want the truth and I will give it to you." Then the defendant made his statement. He said that Cular Davis had on several occasions asked him to rob Mr. Wike and told him he had to raise some money. What has been testified was in the written statement which was freely and voluntarily made. The witness did not threaten him and did not offer him any reward to make the statement. It was made freely and voluntarily without any inducement or threats or promises. It was made on January 17, the day after the body was found. Sheriff Kilgore, deputy sheriff King, and investigator J. P. Hillin were present when the statement was made. Mr. Hillin wrote the statement. The witness identified the statement, which he stated was made to him and signed by the defendant at the request of the witness. The witness noticed a stain on the right coat sleeve of the defendant and asked what it was, and the defendant said it was blood. The witness then identified the coat submitted to him on the witness stand, and testified that the defendant had it on, and the witness had delivered it to Dr. Herman Jones in Atlanta for the purpose of testing it for blood. He first saw the defendant at the home of Cular Davis and he *Page 631 
was wearing the coat at that time. It had blood on it then, and the defendant made no attempt to hide the coat. The statement was written out the next day, the 17th. The defendant was taken to Atlanta, and upon request let the witness have his coat for testing for blood. He was just asked to turn the coat over to them so the test could be made. The defendant said he was to get half of the money obtained from the store. He said he did not get any.
Dr. Herman Jones testified: He was a toxicologist now working in the scientific laboratory of Fulton County. He examined a coat which was obtained from an investigation officer of Georgia Bureau of Investigation, and found blood on an indicated area but was not able to type it. He said it was human blood because he ran the test.
B. B. Kilgore, sheriff, testified: He was called to the scene of the burning. He saw the body. He measured the distance from Cular Davis's house to Mr. Wike's store, and it was two-tenths of a mile. It is a half mile from the defendant's house to Mr. Wike's store. He, Mr. King, Mr. McLemore, and Mr. Hillin were present when the defendant made his statement. He made a statement to Mr. McLemore on the 16th. He also made a statement to the witness alone. When the witness first saw the defendant at the store, he appeared to be drinking. He could smell it.
Ralph Wike testified: C. B. Wike was his father and was seventy-five years old. The picture, Exhibit A, is a picture of his father. Picture D is a correct representation of his father's house and store. He recognized the burned body at the hospital as that of his father.
The State introduced in evidence the written statement of the defendant testified to by the witness McLemore. This statement, according to the reporter's note, went out with the jury, but was not read to it and was not turned over to him. The picture, Exhibit A, identified as that of Mr. Wike, and the picture, Exhibit D, of the store were also introduced in evidence without objection.
The defendant made a statement, in which he said that Cular Davis stated to him that he needed some money and proposed *Page 632 
to the defendant that he "Go up there and knock old man Wike in the head." The defendant said he would have no part in it. Cular Davis then said, "I can fix it so nobody can tell it. . . Go up there and I will knock old man Wike in the head. You go up there and buy some cigarettes, and while he is getting the cigarettes I will come around when you get there . . and knock him in the head." The defendant did not say anything then, but after a while said "I am going and get some cigarettes." The defendant did not know that Davis was coming, but told him that he was going to the store and get some cigarettes. The defendant stated, in substance, that he went to the store, asked for and obtained cigarettes from Mr. Wike, that Mr. Wike sat down and Cular Davis came in behind him, and with a hickory stick about two feet long struck Mr. Wike, and that Mr. Wike leaned over and Davis struck him twice then. The defendant detailed events which are referred to in his confession hereinafter set out, Davis's declaration that he was going to burn the store and his setting fire to some papers on a desk in the store, the defendant's flight from the store, his subsequent arrest, and his statement to the officers. He stated that "Cular Davis is the one that planned it."
B. B. Kilgore, sheriff, recalled, testified that "the stick was about two and a half feet long, and I would say it would weigh about three pounds."
The record also contains as Exhibit "A" a sworn statement of the defendant under date of January 17, 1948, before B. B. Kilgore, Sheriff of Carroll County Georgia; and it was agreed by counsel that it is a true and correct transcript of the statement introduced on the trial of the case. The exhibit shows that the statement was made in the office of the Georgia Bureau of Investigation at 10:45 a. m. on Saturday, January 17, 1948, to investigators William McLemore and J. P. Hillin and in the presence of the sheriff, B. B. Kilgore, and deputy sheriff, Otis King, and is as follows: "Q. Beetles, I want to advise you that you do not have to make a statement of any kind with reference to this crime and want to fully advise you of your constitutional rights that anything that you can say and may be used against you in a criminal procedure. Beetles, do you fully understand your *Page 633 
rights? A. Yes, sir, I understand that I do not have to say anything, but I want to tell you all the truth about the killing of Mr. Wike. Q. Beetles, were you involved in any way in the robbery and the murder of Mr. Charles Bruce Wike and also the burning of his store after same? A. Yes, sir, I went there with Cular Davis after he and me had made plans to rob Mr. Wike. The truth is I went up there before Cular, and he came in after me. Q. Beetles, I want you to go ahead in your own words and tell us all about the robbery and murder of Mr. Charles Bruce Wike on Friday, January 16, 1948. A. I was down at Cular's house yesterday, January 16th, 1948, at about 11:30 a. m., and he said that he had to have some money betwixt this and four o'clock to pay Jack Williams for his whisky. Cular said, `I'll tell you what let's do.' I asked him what, and he said, `Let's go up here and rob Mr. Wike,' and I said, `Cular, I don't want to do that.' I said, `If you want some money, why don't you go to your boss man, Mr. Felix Williams, and borrow it,' and he said, `I can't do that' because Mr. Felix wouldn't let him have any money because he sold whisky. He said, `I'll tell you what you do. You go up to Mr. Wike's and buy a pack of cigarettes,' and while he was making change he would come in the door behind me and he would hit him. About ten minutes after we made this up I went to the store, and when I got in there I saw a white lady, who I had seen before and lives in the neighborhood, drinking a Coca-Cola. . . After she left I asked Mr. Wike for a package of Camel cigarettes. He got up out of a chair in the front of his desk and got them for me, and I gave him a quarter and he went and sat back down at his desk and was getting me my change and he was getting a nickel out of his pocket, but he never did give it to me. While he was sitting in the chair with his back to the door making change, Cular came in the store with a hickory stick about two and a half feet long and hit Mr. Wike on the head three times with it. Cular then said, `I got him now.' Cular said, `I'll tell you what let's do now. Let's set the store on fire and that will keep anybody from finding out who did it.' I said, `Cular, I aint gonna do that,' and then he got the money out of the desk drawer. Just as Cular struck a match and lit some papers on Mr. Wike's desk *Page 634 
I started out the front door. He came out right behind me, and I cut across the field down by the well and went home and ate dinner with my father. The last that I saw of Cular he was trotting in the direction of his coal house. After I ate dinner and got dinner a white lady drove up in the front of our house and she asked my Mama about work, and while they were talking Mama saw the smoke. She said, `J. B., there's a fire down there about Mr. Williams,' and it looked like her son's house. She said that she was going and see what she could find out, and she left, and that left me and my sister Mary and my grandmother, Mary Driver, there at the house. Cular came to my house about ten or fifteen minutes after my mother left. He said, `I did a good job,' and he said, `See it smoking?' and I told him, `Yes.' Mama came in while Cular was there, and said that was Mr. Wike's store and said, `That was mighty bad, wasn't it?' Cular got some buttermilk and meat from my mother, and we left and came by Mr. Wike's store and stopped and looked and he said, `Let's go,' and we went on down to his house. When we got in the house, he pulled the money out and he said, `Here, Kate, take this and do away with it,' and Kate put the money under her head and he said, `Don't you be talking about this.' He said, `Just keep your mouth shut and nobody will ever find it out.' I didn't say nothing else to him. I sat there about thirty minutes, and you all come and got me. Cular left just before you all come. You all got me and went to questioning me, and later I told you the truth about it. Mr. McLemore and Mr. King took me over and showed me a footprint where I came out on the highway, and I identified it as mine that I made when I was on my way home right after the robbery. They then took me over to a house where a lady, who I was told was Mrs. Gant, came out and said that I was the one that was in the store while she was there, and the lady that said this was the lady that was in the store drinking the coke when I went in. Q. Beetles, what was supposed to be your part out of the take on this robbery? A. Cular said that I was to get half. Q. Beetles, did you and Cular ever mention anything before yesterday regarding robbing Mr. Wike's store? A. Yes, sir, I hear Cular say several times that he was going to rob Mr. Wike. Q. Beetles, has anyone *Page 635 
at any time since you have been arrested molested you or beat you in any manner? A. No, sir, I haven't been bothered. I just wanted the truth to be known. I have made the above and foregoing statement free and voluntarily, without threat, hope or promise of immunity, and with the full knowledge that same can and may be used as evidence against me in court."
The exception here is to the judgment overruling the defendant's motion for new trial on the general grounds only.